**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**www.flmb.uscourts.gov**

| | |
|---|---|
| In re: | CASE NO. 6:25-bk-06813 |
| ORLANDO INTERNATIONAL RESORT CLUB CONDOMINIUM ASSOCIATION, INC., | CHAPTER 11 |
| Debtor. | SUBCHAPTER V |
| _____/ | |

**DEBTOR'S EMERGENCY MOTION FOR**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING**
**DEBTOR TO (A) CONTINUE TO USE EXISTING CASH**
**MANAGEMENT SYSTEM, (B) MAINTAIN BANK ACCOUNTS AND CONTINUE USE OF EXISTING**
**BUSINESS FORMS AND CHECKS, AND (C) HONOR CERTAIN RELATED**
**PREPETITION AND POSTPETITION OBLIGATIONS; (II) DETERMINING**
**COMPLIANCE WITH, OR GRANTING A WAIVER OF, CERTAIN INVESTMENT**
**AND DEPOSIT GUIDELINES; AND (III) GRANTING RELATED RELIEF**

**(Emergency Hearing Requested)**

**Basis for Requested Emergency Hearing**

Debtor respectfully requests the Court to conduct an emergency hearing on this Motion, consistent with Local Rule 2081-1(g)(4). Debtor maintains and uses six Bank Accounts[1] across multiple financial institutions as part of its Cash Management System to facilitate its business operations. To avoid substantial disruption to Debtor's business operations and the irreparable harm attendant thereto, Debtor is seeking immediate relief to continue to use its Cash Management System, honor certain prepetition and postpetition obligations (including payment of bank fees), and use existing Business Forms. Changing Debtor's existing Bank Accounts and Business Forms would severely disrupt Debtor's Cash Management System and adversely affect Debtor's ability to maintain the Property. Section 345 of the Bankruptcy Code also imposes certain investment requirements on Debtor. Debtor asserts that all six Bank Accounts, as they are presently held, satisfy the deposit requirements of section 345 because all accounts are either (i) at a UST Approved Depository, or (ii) include deposits held in assets that satisfy the investment requirements of section 345(b).

---

[1] All capitalized terms are defined below.

Debtor seeks a determination that the Bank Accounts are in compliance with the requirements of section 345, or alternatively a waiver of such requirements. Debtor has previewed the relief sought in this Motion with the counsel for the United States Trustee.

**DEBTOR ORLANDO INTERNATIONAL RESORT CLUB CONDOMINIUM ASSOCIATION, INC.** ("Debtor" or "Association") seeks entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Interim Order"), and a final order: (i) authorizing Debtor to (a) continue to use its existing cash management system, (b) continue to use Debtor's existing six bank accounts (each, a "Bank Account" and, collectively, the "Bank Accounts") and existing Business Forms,[2] and (c) honor certain related prepetition and postpetition obligations; (ii) determining that Debtor is in compliance with the deposit requirements set forth in section 345 of the Bankruptcy Code[3] or waiving the requirements thereof, (iii) waiving the *Operating Guidelines and Reporting Requirements for Debtor in Possession and Chapter 11 Trustees (October 2022)* (the "Guidelines") promulgated by the Office of the United States Trustee (the "U.S. Trustee");[4] and (iv) granting any additional relief required in order to effectuate the foregoing. In support of this Motion, Debtor relies upon the *Declaration of Larry Baudoin in*

---

[2] "Business Forms" means Debtor's pre-printed business forms, including checks, business cards, letterhead, envelopes, expense reports, purchase orders and invoices.

[3] All references to the "Bankruptcy Code" refers to 11 U.S.C. §§101-1532.

[4] The Guidelines were issued in order to assist the U.S. Trustee in supervising the administration of chapter 11 cases. Such Guidelines require chapter 11 debtors to, among other things: (a) immediately close all existing bank accounts; (b) immediately open and maintain new debtor-in-possession operating, payroll, and tax accounts which must be held at a U.S. Trustee authorized depository; (c) the requirement to deposit all business revenue into the new debtor-in-possession operating account, with deposits, other than transfers from operating account, should not be made directly to the new debtor-in-possession payroll or tax accounts; and (d) obtain and utilize new checks for all debtor-in-possession accounts which bear the designation "Debtor-in-Possession" and contain certain other information related to the chapter 11 case.

*Support of Debtor's Chapter 11 Petition and First Day Relief* (the "First Day Declaration"),[5] filed contemporaneously herewith, and respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U. S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are Sections 105(a), 345(b) 363(c), and 364 of the Bankruptcy Code, Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure, and Local Rules 2081-1(g)(4) and 9013-1(d).

## BACKGROUND

4.      On October 23, 2025 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11, title 11 of the Bankruptcy Code.

5.      Debtor is a not-for-profit corporation organized under the laws of the State of Florida pursuant to a Certificate of Incorporation filed with the Secretary of State of Florida, in Official Records Book 3197 at Page 2352, et. seq., on October 30, 1980.

6.      Pursuant to its By-Laws, Debtor was organized and exists to administer the Orlando International Resort Club I, a Condominium located in Orange County Florida. The original By-Laws were recorded on May 29, 1981, in the Official Records Book 3197 at Page 2359 through 2373 of the public records of Orange County Florida.

7.      The property governed by the Association includes 63 condominium units, a two-story reception and administration building, a one-story clubhouse, a pool and sports/tennis

---

[5] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

courts on a 4.639$\pm$ acre site commonly known as 5353 Del Verde Way, Orlando, Florida (the "Property").

8.      The ByLaws provide that the owners of the condominium units are the members of the Association (the "Association Members").

9.      The Property operates as a timeshare resort. There are 3,276-unit weeks (or intervals) in the condominium.  Owners of intervals are members in the Association.

10.      Debtor owns 63 intervals at the Property and a concomitant share of the common elements at the Property (the "Association Interest").  The Association Interest comprises 1.92% of the total intervals at the Property.  Debtor is a tenant in common with all other interval owners.

11.      PTVO Owners Association, Inc.  ("PTVO") owns 1,334 intervals at the Property, which is 40.72% of the total intervals. Wyndham Vacation Resorts, Inc. ("WVR") owns 555 intervals at the Property, which is 16.94% of the total intervals. The remaining 1324 intervals (40.42% of the total intervals) are owned by parties to corresponding contracts ("Interval Owners"), with each interval having its own separate corresponding contract.

12.      Vacation Resort Management, Inc. f/k/a Wyndham Vacation Management, Inc. (the "Property Manager") provides management services to the Property for Debtor, pursuant to that certain Amended and Restated Management Agreement between the Property Manager and Debtor, dated as of January 1, 2011 (the "Management Agreement"). Upon information and belief, Property Manager and WVR, an Association Member, are affiliates.

13.      Debtor is operating its business and managing its affairs as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14.      For a detailed description of Debtor and its operations, Debtor respectfully refers the Court and parties in interest to its First Day Declaration.

**RELIEF REQUESTED**

15.     Debtor seeks entry of the Proposed Interim Order on an interim and final basis because any disruption to the Cash Management System would have an immediate adverse effect on Debtor's operating and maintenance of the Property to the detriment of Debtor's estate and all Association Members.   Moreover, Debtor's operating and reserve funds are deposited in compliance with Debtor's operating and reserve account investment policy.

A.      **Debtor's Cash Management System**

16.     In the ordinary course of business, Debtor maintains an integrated, centralized cash management system (the "Cash Management System"). The Cash Management System is comprised of the six (6) Bank Accounts, across three (3) financial institutions (collectively, the "Banks"), through which Debtor manages cash receipts and disbursements. The Bank Accounts are comprised of the following: (a) two (2) accounts with Comerica Bank (with account numbers ending in x7769 and x6897), (b) three (3) accounts with Merrill Lynch (with account numbers ending in x7912, x7833, and x7913), and (c) one (1) account with Wells Fargo (with an account number ending in x8320).  A schedule listing each of the Bank Accounts, including the amount on deposit in each of such accounts as of the Petition Date is attached as **Exhibit B**, in accordance with Local Rule 2081-1(g)(4).

17.     As explained more fully below, Debtor's Cash Management System has three primary categories of Bank Accounts: (a) the two accounts with Comerica Bank, the account with Wells Fargo Bank, and the account with Merrill Lynch ending in x7912 (collectively, the "Operating Accounts") are depository accounts into which cash generated from Debtor's operations is deposited and used to fund Debtor's expenses; (b) the Merrill Lynch account ending in x7833 (the "Reserve Account") is a "reserve" account, into which Debtor deposits money for major repairs and maintaining the value of the Property; and (c) the Merrill Lynch account ending

in x7913 (the "Tax Account"), into which Debtor segregates cash needed to make its real property tax payments.

18.     Three of the six Bank Accounts are maintained at Banks that are approved depositories with the United States Trustee ("UST Approved Depositories"), those being Comerica Bank and Wells Fargo.   With that, these three Bank Accounts are in compliance with section 345(b) and the Guidelines.

19.     Three of the six Bank Accounts are held at Merril Lynch.  The Debtor deposits monies into these accounts in compliance with the Debtor's operating and reserve account investment policy, described further below.

20.     The Debtor respectfully asserts that, all of the funds deposited in the Merrill Lynch accounts satisfy the deposit requirements of section 345(b).   All funds in the Merrill Lynch accounts are invested in either (a) United States government securities (or securities that are backed by the full faith and credit of the United States), or (b) certificates of deposit at FDIC insured banks, with account balances less than the $250,000 FDIC insurance limit.

**B.     The Operating Accounts, Reserve Account and Tax Account**

21.     The Cash Management System is tailored to meet Debtor's operating needs, thereby enabling Debtor to control and monitor corporate funds, segregate and protect certain amounts required by law or Debtor's organization documents, ensure cash availability and liquidity, and reduce administrative expenses by facilitating the efficient movement of funds and the development of accurate account balances.

22.     With respect to Operating Accounts, these accounts each serve their own function within the broader Cash Management System.  Debtor's "main account" is with Wells Fargo (ending in x8320) (the "Main Account"), which is the only account that cuts checks, and which Debtor utilizes to pay all of its ongoing obligations to maintain the Property, including amounts

under the Management Agreement.  At any time, this Main Account generally only holds that cash as required to make payments in the near term (often approximately two-months' worth of expenses), which is generally less than $300,000.00 at any specific time but may fluctuate higher or lower.

23.     Next, Debtor has a "lockbox" account with Comerica Bank (ending in x7769) (the "Lockbox Account"), into which the Interval Owners deposit their annual maintenance fees and other costs and assessments, totaling approximately $3,444,294.00 for fiscal year 2024. The Interval Owners remit their annual fees into the Lockbox Account in general around the first of each calendar year, but some pay in advance and others pay late, meaning there is little activity outside of the months of November through February of each calendar year, with the majority being deposited in December and January.[6]  Several Interval Owners have autopay features on their accounts to make their annual payments to Debtor; however, others pay by check or manual ACH payment as well.  The cash deposited into the Lockbox Account is swept on a daily basis into the other Comerica Bank account (ending in x6897) (the "Sweep Account").  The Sweep Account is a type of savings account that offers Debtor a higher interest rate than the Lockbox Account.  This Sweep Account is where Debtor holds most of its "operating cash" at any time, which it then wires to the Main Account on an as-needed basis to write checks and fund operations.

24.     The final Operating Account is an account with Merrill Lynch (ending in x7912) (the "ML Operating Account"), into which Debtor will move cash from the Sweep Account in order to enable Debtor to generate a higher rate of return and to diversify where the cash is held when it becomes too concentrated in the Sweep Account.  The ML Operating Account invests its

---

[6] As explained below, Debtor has other *de minimis* receipts which are largely outside of the Cash Management System, but which are "trued up" each month.

cash primarily in money market funds that invest almost exclusively (*i.e.*, approximately 99.5%) in United States government-backed securities as well as directly in U.S. Treasury notes.

25.     With respect to the Reserve Account, Debtor funds such account from amounts paid by Interval Owners for fees and costs.  Upon receipt of the annual fees, Debtor immediately segregates a portion of the receipts into the Reserve Account in the amount set forth in the annual budget.  The Reserve Account funds certain capital expenditures and other costs at the Property and any outlays made therefrom are only made to the extent expressly authorized in the annual budget or as are authorized by vote of the Association Members.  Because of the nature of the Reserve Account, the funds are also invested very conservatively—spread across various certificates of deposit, U.S. Treasury notes, and government-security backed money market funds.

26.     To ensure the safety of the funds in the Reserve Account, Debtor has adopted specific investment requirements to ensure the funds are preserved and grow at an appropriate rate over time without risk to the underlying principal (the "Debtor Investment Policy").  Debtor's stated goals with respect to the Reserve Account are, in order of importance, (a) safety of principal, (b) adequate liquidity, and (c) maximizing yields.  As such, the Debtor Investment Policy requires that the Reserve Account utilizes "conservative investments" to avoid principal losses. Primary investment types include money market funds, FDIC-insured certificates of deposit (or related instruments) in amounts not to exceed the FDIC insurance limit, and U.S. Treasury securities. Secondarily, the Debtor Investment Policy provides that Debtor may invest less than 50% of the funds in the Reserve Account in U.S. Government Agency securities, insured/AAA rated tax-free municipal securities (with an underlying issuer rating of at least A), and funds composed primarily of U.S. Treasury Securities and/or Government Agency securities. Thus, under the Debtor

Investment Policy, Debtor conservatively invests the funds in the Reserve Account to ensure the safety of principal and adequate liquidity in the Reserve Account.

27.     Finally, in accordance with Florida law, Debtor segregates and escrows its annual property taxes in the Tax Account.  Debtor estimates its property taxes each year and deposits, on a monthly basis, a proportional share of its estimated property tax bill into the Tax Account. Debtor transfers cash from the Main Account to the Tax Account manually and, thereafter, pays the tax bill directly from the Tax Account.  Once again, based on the nature of the Tax Account, Debtor invests the money conservatively to ensure its safety, including in federal security backed money market funds, as noted above, and U.S. Treasuries.

28.     As noted above, though certain of the transfers into the Operating Accounts are made on an *ad hoc* basis, many of the collections related to the members' assessments and fees are automatically deducted from their bank accounts and deposited into the Operating Accounts on the proper cadence.  Similarly, many of the payments from the Operating Accounts are also automated in order to ensure Debtor satisfies all of its obligations on a timely basis.  Without this automation, Debtor's collection and payment processes may be disrupted.

29.     Through the Property Manager, Debtor maintains detailed accounting records that track transfers of funds to and from the Bank Accounts as a part of normal operations. The Property Manager will continue these practices as part of ongoing operations during the pendency of this case in order to maintain governance, manage liquidity, and meet court reporting requirements.  It is imperative that Debtor be able to continue using its existing Cash Management System, as it is designed to ensure (a) the safety of the cash received, (b) the adequate funding of operations and maintenance as well as taxes, and (c) compliance with local law.  Thus, though its operations are relatively simple, its Cash Management System is necessarily complex.  Moreover,

as noted above, a substantial portion of Collections and remittances are automated for convenience to the Interval Owners as well as Debtor.  Debtor has automated payments scheduled and in place with respect to a substantial portion of its operations as do the Interval Owners.  Any change to this system, therefore, would cause, at best, immediate disruption in collections as well as unnecessary delays, and, at worst, potential violations of applicable law.

**C.   Bank and Processing Fees**

30.     In the ordinary course of business, Debtor incurs periodic service charges and other fees from the Banks in connection with the maintenance of the Cash Management System (such charges and fees, the "Bank Fees").  On average, Debtor pays, in the aggregate, $785.00 each month on account of such Bank Fees.  As of the Petition Date, Debtor estimates that there are approximately $519.11 in outstanding Bank Fees, with approximately $785.00 coming due within thirty (30) days of the Petition Date.

**D.   Corporate Credit Card Program & D&O Expense Program**

31.     In its normal course of operations, Debtor provides (through the Management Agreement) certain employees with corporate credit cards (the "Corporate Credit Cards"),[7] which employees can use on behalf of Debtor and in connection with Debtor's expense policies to make work-related purchases.  Debtor's Corporate Credit Cards are issued through Wells Fargo's "Wells One" program and are governed Corporate Card Program and related agreements.  Specifically, each card is issued in the name of the actual user (rather than the business) and may only be used for expenses of Debtor.  Pursuant to the Corporate Card Program, Debtor may not exceed maximum exposure of up to $40,000.00 plus interest, fees, costs, and other charges related thereto

---

[7] The Property manager has obtained several corporate cards on behalf of various timeshare associations with which it is affiliated, pursuant to that certain Wyndham Destinations Purchasing Card (P-Card) Policy and Program (the "Corporate Card Program").  Three of the corporate cards issued under the Corporate Card Program are used for Debtor's operations as set forth herein.

or accruing with respect thereto, which total is allocated across the three users of the Corporate Credit Cards (with one having a limit of $20,000.00 per month and the other two having limits of $10,000.00 each).  As related to Debtor's operations, there are three Corporate Credit Cards in use, all of which are issued by Wells Fargo directly to the users as part of the Corporate Card Program. At the close of each pay cycle, Debtor initiates a payment to the Property Manager, which then remits payment to Wells Fargo to pay down the outstanding balance on the Corporate Credit Cards.

32.      By this Motion, Debtor seeks authority, but not direction, to continue utilizing the Corporate Credit Cards, paying expenses related thereto (each in the ordinary course of business), and honoring any outstanding obligations related to the Corporate Credit Cards, regardless of whether they arose before or after the Petition Date.  Debtor estimates that it incurs liabilities of approximately $15,326.61 per month on account of the Corporate Credit Cards in the aggregate. As of October 20, Debtor estimates that it owes approximately $7,029.71 on account of the Corporate Credit Cards, all of which will become due and owing within 30 days of the Petition Date.

33.      In addition to the Corporate Credit Cards, prior to the Petition Date, and in or the ordinary course of Debtor's business, Debtor's directors and officers also incurred certain expenses related to the fulfillment of their obligations to Debtor for which they are entitled to reimbursement (such expenses, the "Corporate Expenses").  Pursuant to that certain Officer and Director Travel Expense Reimbursement Policy, dated as of November 6, 2016 (the "D&O Expense Program"), the directors and officers of Debtor are entitled to receive reimbursement for (as necessary) mileage/airfare expenses, hotel accommodations, and $150 of per diem for expenses related to board meetings and other obligations incurred as a result of their position.  In order to receive

reimbursement for such expenses, each director and/or officer must submit an "Expense Reimbursement Request Form" along with receipts evidencing particularized expenses.

34.     It is difficult for Debtor to determine the exact amount of the Corporate Expenses outstanding as of the Petition Date, because, among other things, the directors and officers may have expenses that they have yet to submit to Debtor for reimbursement.  On average, Debtor pays approximately $800.00 per month on account of the Corporate Expenses.  Debtor estimates that there are no Corporate Expenses outstanding as of the Petition Date; however, to avoid any harm to the directors and officers, Debtor seeks authority, but not direct, to continue reimbursing the Corporate Expenses as they come due under the D&O Expense Program in the ordinary course of business and in accordance with its prepetition policies and practices, regardless of when such expenses accrued.

**E.      Credit Cards and Other Payment Processors**

35.     In addition to cash receipts from Interval Owners for their annual fees, Debtor also receives payment for certain *ad hoc* services and transactions, including parking, additional housekeeping services, damages or room repairs; such payments are made at physical credit card terminal(s) at the Property, or paid via online or in-app portals (the "Non-Cash Payments"). To process Non-Cash Payments, the Property Manager is party to certain agreements (the "Payment Processing Agreements") with certain point-of-sale and merchant service providers, including but not limited to Braintree (each, a "Payment Processing Company," and collectively, the "Payment Processing Companies").

36.     The Payment Processing Agreements are with the Property Manager through the Management Agreement, because the amounts allocable to Debtor are relatively small, with payments for parking being the largest portion of receipts totaling approximately $4,400 per month.  The Payment Processing Companies have contracted with the Property Manager, which

also manages other timeshare associations and is able to obtain economies of scale by aggregating these services across all of its managed properties. When receipts are generated at the Property, the Property Manager makes a book entry for the amount of such receipts that are owned by Debtor and when Debtor makes its payment to the Property Manager under the Management Agreement for the Property Manager's services, these receipts are setoff against such obligations. As such, Debtor ultimately obtains the benefit of these receipts; however, it does so by obtaining a reduction total amount it owes to the Property Manager for fees and expenses.[8] The Property Manager passes along the processing fees charged by the Payment Processing Companies to Debtor under the Management Agreement, which amount is generally 3.0 percent of processed amounts allocable to the payments to Debtor (the "Processing Fees"). As of the Petition Date, Debtor owes approximately $57.60 in Processing Fees, all of which will become due and payable within thirty (30) days of the Petition Date (the "Interim Period").

37. Debtor's continued acceptance of Non-Cash Payments is essential to the operation of Debtor's business because certain of Debtor's receipts can only be generated by use of Non-Cash Payments. Declining to accept Non-Cash Payments would have a negative effect on Debtor's ongoing operations, the cost of which would be borne by its estate. To avoid disrupting these vital payment processing services, Debtor seeks authority, but not direction, to pay any prepetition Processing Fees incurred in connection with processing any Non-Cash Payments and to continue paying the Processing Fees in the ordinary course of business pursuant to the terms of the Payment Processing Agreements and the Management Agreement, in a manner consistent with past practices.

---

[8] To date, these Non-Cash Payments have never exceeded the amount of the fees Debtor owes to the Property Manager under the Management Agreement, so it has never had a "net receivable" from the Property Manager on account of Non-Cash Payments. Nevertheless, to the extent such amounts do exceed what Debtor owes the Property Manager for services under the Management Agreement, the Property Manager would remit such funds to Debtor.

**F.      Debtor's Existing Business Forms**

38.      As part of the Cash Management System and in the ordinary course of business, Debtor uses numerous pre-printed business forms.  To minimize the expense to Debtor's estate, Debtor respectfully requests that the Court authorize Debtor to continue to use all pre-printed business forms, including business cards, letterhead, envelopes, expense reports, purchase orders and invoices (collectively, the "Business Forms") as such forms were in existence immediately prior to the Petition Date, without reference therein to Debtor's status as "Debtor in Possession" rather than requiring Debtor to incur the expense and delay of ordering entirely new Business Forms as required under the Guidelines.  The Debtor has prepared a Notice of Chapter 11 Bankruptcy Case (substantially in the form of Official Form 309F1) and intends to serve that notice on all creditors and other known parties in interest (with the assistance of Omni Agent Solutions, Inc., the Debtor's proposed notice, claims, and solicitation agent).  Debtor believes that these direct communications will provide adequate notice of the commencement of this Chapter 11 Case as well as the Debtor's status as debtor in possession, obviating any risks of confusion over Debtor's status as debtor-in-possession.

## MAINTENANCE OF DEBTOR'S EXISTING BANK ACCOUNTS, CASH MANAGEMENT SYSTEMS, CHECKS, AND BUSINESS FORMS IS WARRANTED

**A.      Waiver of Guidelines**

39.      By this Motion, Debtor seeks a waiver of certain operating Guidelines established by the U.S. Trustee for debtors in possession for the purpose of supervising the administration of chapter 11 cases.  These Guidelines require chapter 11 debtors to, among other things, (a) close all existing bank accounts, (b) open new debtor-in-possession ("DIP") bank accounts in certain financial institutions designated as authorized depositories by the U.S. Trustee, (c) establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes),

(d) maintain a separate DIP account for cash collateral, and (e) obtain checks for all DIP accounts that bear the designation, "debtor-in-possession," the bankruptcy case number, and the type of account. The Guidelines also require a debtor to close its books and records as of the petition date and to open new books and records. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims. Through this Motion, Debtor seeks relief from each of these requirements.

**B.    Books & Records**

40.    Debtor seeks a waiver of the requirement that it opens a new set of books and records as of the Petition Date. Debtor respectfully submits that opening a new set of books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay. With the use of computer technology, it is now easy to differentiate between pre- and postpetition transactions by date. Debtor, in the ordinary course of its business, uses many checks, invoices, stationery, and other business forms. By virtue of the nature and scope of the businesses in which Debtor is engaged and the numerous other parties with whom Debtor deals, Debtor needs to use its existing Business Forms without alteration or change. A substantial amount of time and expense would be required in order to print new business forms. Fulfillment of the requirement would likely cause more harm than good, including requiring Debtor to incur unnecessary expenses and potentially delay payment of claims. Accordingly, Debtor respectfully requests that it be authorized to continue to use its existing business forms and to maintain its existing business records.

**C.      Request for Determination of Compliance with or, in the Alternative, Waiver of Section 345(b) Deposit Requirements**

41.      By this Motion, Debtor also seeks a determination that Debtor is in compliance with the deposit requirements set forth in section 345(b) of the Bankruptcy Code—and, to the extent the Court finds to the contrary, waiver of the same—to permit Debtor to maintain its existing Bank Accounts and Cash Management System.   Section 345(b) of the Bankruptcy Code sets forth specific requirements for deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States … or backed by the full faith and credit of the United States …."  11 U.S.C. § 345(b).  For such deposits or investments, section 345(b) requires, from the entity with which the money is deposited or invested, a bond in favor of the United States secured by the undertaking of a surety, or, in the alternative, a deposit of securities of the kind specified in section 9303 of title 31.  These requirements may be waived by the Court "for cause."

42.      Debtor believes that it is in compliance with the section 345(b) deposit requirements.  As set forth above, three of the Bank Accounts are with UST Approved Depositories that have signed uniform depository agreements with the U.S. Trustee (*i.e.*, Wells Fargo and Comerica). With respect to the remaining three accounts held at Merrill Lynch, Debtor's funds are all invested in either: (a) United States government securities (or securities that are backed by the full faith and credit of the United States), or (b) certificates of deposit at FDIC insured banks, with account balances less than the $250,000 FDIC insurance limit.

43.      Accordingly, Debtor's cash in the Bank Accounts is deposited in compliance with section 345(b) of the Bankruptcy Code.

44.      Nevertheless, to the extent the Court disagrees with Debtor's analysis above, Debtor requests that the Court grant it a waiver of the requirements to comply with section 345(b).

In short, the benefits of imposing the requirements of section 345(b) in this case are outweighed by the cost and disruption of opening new accounts and altering Debtor's investment practice.

45.    "Cause" exists to waive the requirements of Section 345.  As noted above, Debtor believes that the Banks at which it maintains its accounts are financially stable banking institutions and are insured either by the Federal Deposit Insurance Corporation ("FDIC") or the Securities Investor Protection Corporation ("SIPC").  Only one of the of the Banks—*i.e.*, Merrill Lynch— is not a UST Approved Depository.  Nevertheless, it is a highly rated financial institution that is recognized as well-capitalized and financially stable.  Moreover, the funds invested in the Reserve Account are all made in accordance with Debtor's internal Debtor Investment Policy as detailed above to ensure that the investments are safe and secure, with the emphasis of such policy being to protect the principal.  Therefore, notwithstanding that these Bank Accounts are not with an institution that is a UST Approved Depository in this jurisdiction, Debtor believes that estate funds at the specific accounts in question will be protected during the Chapter 11 Case to the same extent as funds at the authorized depositories.

46.    Additionally, as explained above, Debtor's Bank Accounts comprise an established Cash Management System that Debtor needs to maintain in order to ensure that collections and disbursements from the Bank Accounts are not disrupted.  Debtor has automated large portions of its Cash Management System, including with respect to many of the payments it receives from Interval Owners and the payments it remits to its vendors.  Debtor will note the date and time the chapter 11 petition was filed, and the records will reflect each postpetition receipt and disbursement.  Therefore, a waiver of the section 345(b) deposit requirements would not pose a risk to Debtor's estate or its creditors.  Accordingly, Debtor requests that its existing accounts be deemed DIP accounts, and that their maintenance and continued use be authorized.

**D.      Request for Authorization to Maintain Existing Business Forms**

47.      Debtor also seeks authority to continue to use its pre-petition Business Forms without reference to its status as debtor in possession.  Changing correspondence and business forms would be unnecessary and burdensome, expensive, and disruptive.  Given the nature of Debtor's business, and the numerous suppliers of goods and services, vendors, and others with whom Debtor transacts business, it is imperative that Debtor be permitted to continue to use its existing Business Forms without change.

48.      Authorization to use the Business Forms will facilitate a smooth and orderly chapter 11 case, minimize the disruption of Debtor's business affairs (without violating the requirements of, or the policies underlying, the Bankruptcy Code), and enable Debtor to more effectively and expeditiously achieve a conclusion to this Chapter 11 Case.  Vendors doing business with Debtor will be aware of Debtor's status as debtor-in-possession as a result of receiving notice of the commencement of the case.  Debtor accordingly requests that it be authorized to use its existing Business Forms without being required to label each with the "debtor-in-possession" identifier.

## AUTHORITY FOR RELIEF

**A.      Continued Used of the Cash Management System Is Essential to Debtor's Business Operations**

49.      Debtor should be authorized to continue to use its existing Bank Accounts and Cash Management System.  Debtor will work closely with each Bank at which a Bank Account is held to ensure that appropriate procedures are in place so that checks issued prior to the Petition Date, but presented after the Petition Date, will not be honored absent approval from the Court.  Debtor will also maintain records of all transfers within the Cash Management System so that all transfers

and transactions will be documented in its books and records to the same extent such information was maintained by Debtor prior to the Petition Date.

50.     Permitting Debtor to use its existing Bank Accounts and Cash Management System is in the best interest of Debtor's estate, its creditors, and other interested parties. Requiring Debtor to use new accounts would be disruptive to its business and would impair its efforts to maximize the value of the estate. Moreover, having to open new accounts as of the Petition Date would unnecessarily distract Debtor's key decisionmakers, whose efforts are more appropriately focused on assisting with the efforts related to the Chapter 11 Case. Furthermore, any delays or disruption in the payment of vendors, taxes, and utilities resulting from changing Bank Accounts could result in interruptions to such services or result in audits, which could disrupt Debtor's operations and cause distractions at this critical juncture.

51.     Conversely, maintenance of Debtor's prepetition Bank Accounts and Cash Management System would avoid delays in the payment of such necessary expenses and will ensure a smooth transition into chapter 11 without the inconvenience, cost, confusion, and delay associated with transferring cash management operations to new accounts. By allowing the continued use of its existing Bank Accounts and Cash Management System, Debtor will have the unimpeded cash flow necessary for the interim maintenance of its operations. Accordingly, Debtor respectfully requests authorization to maintain its Bank Accounts and Cash Management System in the ordinary course of its business, *provided that* no prepetition checks, drafts, wire transfers, or other forms of tender that have not yet cleared the relevant drawee Bank as of the Petition Date will not be honored unless authorized by separate order of this Court.

52.     Debtor also requests authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance

of the Bank Accounts.   The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Bank Accounts.   In accordance with existing practices, Debtor will maintain strict records of all receipts and disbursements from the Bank Accounts during the pendency of this case and will ensure that its records properly distinguish between pre- and postpetition transactions.

53.     Debtor's request for authorization to continue to use the Cash Management System consistent with section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).   Section 363(c)(1) is intended to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without undue oversight by creditors or the court.   *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (same).   Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system.   *See Amdura Nat'l Distrib. Co. v. Amdura Corp., (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996) (noting that certain postpetition transfers were "no more than a continuation of the routine transactions nececessitated by the cash management systems the companies had adopted[; a] debtor in possession under chapter 11 is generally authorized to continue operating its business") (citing 11 U.S.C. § 363(c)).   Nevertheless, Debtor has filed this Motion out of an abundance of caution, to the extent any aspect of the Cash Management System could be considered as outside the ordinary course of business for purposes of section 363(c) of the Bankruptcy Code.

54.     Bankruptcy courts routinely permit chapter 11 debtors to maintain their existing cash management systems, generally treating such requests as a relatively "simple matter."

*See In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993); *see also In re Columbia Gas Sys.*, 997 F.2d 1039, 1061 (3d Cir. 1993) (recognizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient"); *The Charter Co. v. Prudential Ins. Co. of Am. (In re The Charter Co.)*, 778 F.2d 617, 621 (11th Cir. 1985) (holding that allowing the debtors to use their prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code); *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1114 (5th Cir. 1995) (maintaining an existing cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

55. The Court may also exercise its equitable powers to grant the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) is intended "to assure the bankruptcy courts['] power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction." 2 COLLIER ON BANKRUPTCY ¶ 105.01 (15th ed. 2015).

56. Continuing the Cash Management System without interruption is important to the success of the Chapter 11 Case, and it is well within the Court's equitable power under section 105(a) to approve its continued use.

**B.      The Court Should Waive Certain Requirements of the Guidelines, Including Authorizing Debtor to Maintain Existing Bank Accounts**

57.      Debtor should also be granted authority to maintain its existing Bank Accounts. As set forth above, the U.S. Trustee has established certain operating Guidelines for debtors-in-possession to supervise the administration of chapter 11 cases.  Debtor seeks a waiver of the U.S. Trustee's guideline that the accounts be closed and that new postpetition bank accounts be opened. Subject to a prohibition against honoring prepetition checks without specific authorization from this Court, Debtor requests that the Bank Accounts be deemed to be debtor-in-possession accounts, and that its maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.  Debtor represents that if the relief requested in this Motion is granted, it will not pay— and each of its Banks will be directed not to pay—any debts incurred before the Petition Date, other than as authorized by this Court.

58.      Debtor should be granted further relief from the Guidelines to the extent that they require Debtor to make all disbursements by check.  In particular, the Guidelines require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement.  Consistent with its past practices, Debtor must conduct transactions by debit, wire, or ACH payments and other similar methods, as discussed above, otherwise it risks its professionals overlooking or forgetting to make vital payments.  In addition, Debtor receives a portion of its receipts from credit card purchases through ACH payments from the credit card companies.  To deny Debtor the opportunity to conduct transactions by debit, wire, or ACH payments or other similar methods would interfere with Debtor's performance of its contracts and unnecessarily disrupt Debtor's business operations, as well as create additional costs to Debtor.

**C.    The Court Should Authorize Debtor to Maintain the Respective Programs and Continue Honoring the Expenses Incurred in Connection with the Corporate Credit Cards and Corporate Expenses**

59.    Section 363(b)(1) of the Bankruptcy Code provides as follows: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estates…." 11 U.S.C. § 363(b)(1).  A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon a sound business purpose. *See In re Filene's Basement, LLC*, No. 11-13511, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("Transactions under § 363 must be based upon the sound business judgment of the debtor or trustee."); *The Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (same).  Further, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

60.    Moreover, as noted above, section 105(a) grants bankruptcy courts broad authority and discretion to enforce the provisions of the Bankruptcy Code under equitable common law principles.  The purpose of section 105 is to ensure that the bankruptcy court has the power "to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 COLLIER ON BANKRUPTCY ¶ 105.01 (16th ed. 2020).

61.    Pursuant to these provisions, courts allow the immediate payment of prepetition claims where such payment is essential to the debtor's continued operations. *See In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (recognizing that "if payment of a [prepetition] claim … is essential to the continued operation of the [debtor,] … payment may be authorized …."); *In re Motor Coach Indus. Int'l*, No. 09-078 (SLR), 2009 WL 330993, at *2 n.5 (D. Del. Feb. 10, 2009) ("The 'doctrine of necessity' or 'necessity of payment' doctrine is a general rubric for the proposition that a court can authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor."). Indeed, the Supreme Court of the United States (in dicta) tacitly endorsed motions seeking to pay certain prepetition claims pursuant to the doctrine of necessary in order to "enable a successful reorganization and make even the disfavored creditors better off." *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017) ("Courts, for example, have approved 'first-day' wage order that allow payment of employees' prepetition wages … to be paid first on their prepetition claims…. In doing so, these courts have usually found that the distributions at issue would enable a successful reorganization and make even the disfavored creditors better off.") (internal citations and quotation marks omitted) (emphasis added).

62.    Continuing satisfaction of the obligations arising under the Corporate Credit Cards and the D&O Expense Program each qualify under the foregoing rubric. Debtor must continue its corporate policies of reimbursing its agents, directors, and officers by the Corporate Credit Cards and/or as Corporate Expenses to enable such individuals to perform their jobs effectively. Without the Corporate Credit Cards, Debtor may be unable to continue purchasing certain necessary items for the Property. Similarly, without incurrence of the Corporate Expenses, the directors and

officers may shirk their duties to Debtor, as they are not otherwise compensated and would need to bear the burden of travel expenses themselves while performing services for Debtor's benefit.

63.     In order to ensure the continued efficient operation of Debtor's business, as well as a smooth transition into chapter 11, Debtor should be authorized to continue honoring these expense programs and policies.

**D.     The Court Should Authorize the Banks Participating in the Cash Management System to Honor Certain Transfers and Charge Bank Fees and Certain Other Amounts**

64.     Contemporaneously with the filing of this Motion, Debtor has filed a number of "first day" motions requesting authority to pay certain prepetition claims in the ordinary course of business in order to avoid immediate and irreparable harm to its operations as it transitions into chapter 11.  With respect to certain of these obligations, prior to the Petition Date, Debtor issued checks that have yet to clear the banking system.  Moreover, Debtor intends (a) to issue checks postpetition on account of such prepetition debt once the Court enters an order permitting Debtor to take such actions and (b) to inform the Banks as to which prepetition checks they should honor pursuant to orders of the Court authorizing such payment.

65.     As a result of the foregoing, Debtor requests that the Banks be authorized to accept and fulfill all representations from Debtor as to which checks, drafts, wires, or ACH transfers (each, a "Disbursement") they should honor, consistent with any order of this Court and governing law, whether such Disbursements are dated prior to, on, or subsequent to the Petition date; *provided, however,* that to the extent Debtor directs the Banks to dishonor any Disbursements or the Banks inadvertently dishonor any Disbursements, Debtor may issue a replacement Disbursement consistent with the orders of this Court.  Pursuant to the relief requested in this Motion, the Banks will not be liable to any party, including, without limitation, Debtor and its estate, on account of (a) following Debtor's instructions or representations as to any order of this

Court, (b) the honoring of any Disbursement in a good faith belief that Debtor or the Court authorized such prepetition Disbursement to be honored, or (c) an innocent mistake made despite the Bank's implementation of normal and customary item-handling and clearing procedures in respect of the Disbursements. Such relief is reasonable and appropriate, because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

66.     Finally, in connection with the Cash Management System, the Banks charge—and Debtor pays, honors, or allows the deduction from the appropriate account—certain Bank Fees. As with the Cash Management System, payment of the Bank Fees will minimize disruption to Debtor's operations and is therefore in the best interests of the estate. Absent payment of the Bank Fees, the Banks might assert setoff rights against the funds in the Bank Accounts on account of the Bank Account Claims, freeze the Bank Accounts, or refuse to provide banking services to Debtor. Accordingly, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, Debtor seeks authority, in its sole discretion, to pay or to reimburse the Banks in the ordinary course of business for any Bank Fees arising prior to or after the Petition Date.

**E.      Debtor Should Be Authorized to Use Existing Business Forms**

67.     In the ordinary course of its business, Debtor uses a multitude of business forms. By virtue of the nature of Debtor's business, it is important that Debtor be permitted to continue to use its existing business forms without alteration or change. Accordingly, pursuant to sections 363(c) and 105(a) of the Bankruptcy Code, Debtor requests that it not be required to include the legend "Debtor-in-Possession" and the corresponding bankruptcy case number on any business forms immediately upon the commencement of the Chapter 11 Case. Absent this relief, Debtor's estate will be required to bear potentially significant and unnecessary expenses, which Debtor respectfully submits is unwarranted. Because parties that presently conduct business with

26

Debtor likely will be aware of Debtor's status as debtor in possession, the alteration of Debtor's checks and business forms would be unnecessary and unduly burdensome.

**F.      The Court Should Determine that the Debtor is in Compliance with, or Alternatively Waive the Requirements of—Section 345(b) of the Bankruptcy Code**

68.      As noted above, the Debtor believes it is in compliance with section 345(b) of the Bankruptcy Code.  Once again, three of the Bank Accounts are held at UST Approved Depositories in this jurisdiction, and the other three Bank Accounts are with a large, well-capitalized Bank, at which the Debtor invests its funds in either: (a) United States government securities (or securities that are backed by the full faith and credit of the United States), or (b) certificates of deposit at FDIC insured banks, with account balances less than the $250,000 FDIC insurance limit. Given these facts, the Debtor believes that its conservative investment strategies render it in compliance with the requirements of section 345(b).

69.      Alternatively, to the extent the Court disagrees, Debtor seeks a waiver of the deposit requirements set forth in section 345(a) of the Bankruptcy Code to permit Debtor to maintain its existing Bank Accounts even if they are not in full compliance with the requirements thereof. Pursuant to section 345(b) of the Bankruptcy Code, for any deposit or other investment made by a debtor (except those insured or guaranteed by the United States or by department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States), the U.S. Trustee shall require from the debtor either (a) a bond in favor of the United States that is secured by the undertaking of a corporate surety approved by the U.S. Trustee or (b) the deposit of securities of the kind specified in section 9303 of Title 31 of the United States Code. *See* 11 U.S.C. § 345(b).  Section 345(b) provides further, however, that a court may allow the use of alternatives to those approved investment requirements "for cause."  *See* 11 U.S.C. § 345(b)(2); *see also In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).   In *Service*

*Merchandise*, the court identified the following factors as a guide for determining whether "cause" exists to waive the requirements of section 345(b):

    a.    the sophistication of the debtor's business;

    b.    the size of the debtor's business operations;

    c.    the amount of investments involved;

    d.    the bank ratings of the financial institutions where the debtor's funds are held;

    e.    the complexity of the case;

    f.    the safeguards in place with the debtor's own business for ensuring the safety of the funds;

    g.    the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

    h.    the benefit to the debtor of current practices;

    i.    the harm, if any, to the estate; and

    j.    the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*Serv. Merch.*, 240 B.R. at 896. Examining the foregoing factors, the *Service Merchandise* court concluded that "cause" existed, because the debtors were "large, sophisticated [companies] with a complex cash management [system]" that had the ability to shift money as needed to ensure the safety of their funds. *Id.* Moreover, the benefits to the debtors of waiving the section 345(b) requirements far outweighed any potential harm to the estates, and the failure to waive the requirements "would [have] needlessly handcuff[ed] the[] debtors' reorganization efforts." *Id.* at 896–97 (internal quotation marks omitted).

    70.    In this case, Debtor satisfies at least six of the ten prongs in *Service Merchandise*. With respect to prong (c), Debtor holds only relatively small amounts of investments, and for those investments it holds, they are subject to a stringent and conservative investment policy. For

prong (d), Debtor's Bank Accounts are at large, stable banks, each of which is insured by the FDIC or SIPC.  With respect to prongs (e), (h), and (i), the Chapter 11 Case includes a sophisticated Cash Management System that provides material benefits to Debtor's estate by ensuring Debtor remains in compliance with Florida law and allowing it to move cash to where it is most productive and/or subject to the least risk—the disruption of which could cause serious compliance problems for Debtor.  For prong (f), Debtor has a stringent investment policy in place to ensure the safety of its cash on hand.  In other words, as in *Service Merchandise* and chapter 11 cases in which courts in this jurisdiction have granted requests for approval of the continued use of prepetition deposit accounts, the facts and circumstances of this Chapter 11 Case similarly justify a waiver of section 345(b)'s requirements.

71.      In light of the safety of Debtor's Bank Accounts, Debtor respectfully requests that, to the extent its practices do not comply with the requirements of section 345(b) of the Bankruptcy Code the Court waive Debtor's requirement to comply therewith at least until entry of any final order granting the relief requested herein, without prejudice to Debtor's ability to seek a further or final waiver of such requirements.  If such waiver is only granted for an interim period, Debtor will engage in discussion with the U.S. Trustee and any statutory committee appointed in these Chapter 11 Case to determine whether and to what extent any modifications to its existing banking practices are appropriate given the circumstances.

72.      Without the relief requested in this Motion, Debtor's business operations will suffer adverse consequences.  Any significant disruption of Debtor's operations that adversely affects the quality services to the Interval Owners will likely make it difficult, and perhaps impossible, to advance an efficient sale of the Property that will maximize value for all constituents.

Accordingly, Debtor requests that the Court enter an order granting the relief requested in this Motion.

73.     Extensive authority supports the relief Debtor seeks by this Motion.   In other chapter 11 cases, courts have recognized that strict enforcement of requirements of the Guidelines and section 345(b) of the Bankruptcy Code often do not serve their desired purposes—particularly in complex, sophisticated chapter 11 cases.   Accordingly, courts in this and other districts have granted relief from these requirements and replaced them with alternative procedures.   *See, e.g., In re Red Lobster Management LLC*, No. 6:24-bk-02486-GER (Bankr. M.D. Fla. June 14, 2024); *In re Surge Transportation, Inc.*, No. 3:23-bk-1712-JAB (Bankr. M.D. Fla. Mar. 19, 2024); *In re Stein Mart, Inc., et al.*, No. 3:20-bk-2387 (JAF) (Bankr. M.D. Fla. Sept. 16, 2020); *In re WRS Holding Co.*, No. 8:14-bk-08588-CPM (Bankr. M.D. Fla. Aug. 13, 2014); In re Land Resource, LLC, No. 6:08-bk-10159-KSJ (Bankr. M.D. Fla. Oct. 31, 2008); *In re Gemini Air Cargo Logistics, Inc.*, No. 06-10790-BJC-AJC (Bankr. S.D. Fla. Mar. 20, 2006).

## <u>SATISFACTION OF BANKRUPTCY RULE 6003(B)</u>

74.     Debtor respectfully requests expedited consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."   Here, Debtor believes an immediate and orderly transition into chapter 11 is critical to the viability of its operations and that any delay in granting the relief requested could hinder Debtor's operations and cause irreparable harm.   Indeed, without the Cash Management System, payments may not be made in a timely fashion, and Debtor would be unable to track incoming receipts.   This would likely result in the refusal of essential services, thereby causing a diminution in the value of Debtor's estate to the detriment of all parties in interest and, thus, result in immediate and irreparable harm.   In other words, the failure to receive the requested relief during

the first 21 days of this Chapter 11 Case would severely disrupt Debtor's operations at this critical juncture.  Accordingly, Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully requests that the Court approve the relief requested in this Motion on an expedited basis.

### **REQUEST FOR WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)**

75.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth throughout this Motion, any disruption in, among other things, Debtor's ability to continue to use the Cash Management System would be detrimental to Debtor, its creditors, and its estates, and would impair Debtor's ability to optimize its business performance at this critical time as it begins the chapter 11 process.  For this reason and those set forth above, Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Interim Order.

76.     To implement the foregoing immediately, Debtor also respectfully requests a waiver of the notice requirements of Bankruptcy Rule 6004(a), to the extent they are applicable to the Proposed Interim Order.

77.     No prior motion for the relief requested herein has been made to this or any other court.

78.     As required by Local Rule 2081-1(g)(4)(E), the undersigned proposed counsel for Debtor represents that they have consulted with the U.S. Trustee regarding the relief requested herein.

31

## **RESERVATION OF RIGHTS**

79.     Nothing contained in this Motion or any order granting the relief requested in this Motion, and no action taken pursuant to such relief requested or granted, is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against Debtor under the Bankruptcy Code or other applicable nonbankruptcy law; (b) an impairment or waiver of Debtor's or any other party in interest's right to dispute any claim against, or interest in, Debtor, its property, or its estate on any grounds; (c) a promise or requirement to pay any claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (f) an implication, admission, or finding as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on the property of Debtor or its estate; (g) an impairment or waiver of any claims or causes of action which may exist against any entity; or (h) a waiver of Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

**WHEREFORE**, Debtor respectfully requests the entry of Proposed Interim Order, substantially in the form attached hereto as **Exhibit A**, and a final order (i) granting the Motion; (ii) authorizing, but not directing, Debtor to (a) continue to use its existing Cash Management System, (b) continue to use Debtor's existing Bank Accounts listed in the attached **Exhibit B** and existing Business Forms and checks, (c) continue to use the Corporate Credit Cards in the ordinary course; and (d) honor certain related prepetition and postpetition obligations; (iii) determining that the Bank Accounts satisfy the deposit requirements of section 345(b), or otherwise waiving compliance with such requirements; (iv) waiving compliance with  the Guidelines promulgated by

the U.S. Trustee; and (v) granting any additional relief required in order to effectuate the foregoing that the Court deems just and proper.

Date:  October 23, 2025

Respectfully submitted,

/s/ Jeffrey T. Kucera
Jeffrey T. Kucera
**K&L GATES LLP**
Southeast Financial Center, Suite 3900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 539-3300
Email:   jeffrey.kucera@klgates.com

- and -

Daniel M. Eliades (*pro hac vice* pending)
Peter J. D'Auria (*pro hac vice* pending)
**K&L GATES LLP**
One Newark Center, Tenth Floor
Newark, NJ 07102
Telephone: (973) 848-4000
Email: daniel.eliades@klgates.com
        peter.dauria@klgates.com

- and -

Jonathan N. Edel (*pro hac vice* pending)
**K&L GATES LLP**
300 South Tryon St., Suite 1000
Charlotte, NC 28202
Telephone: (704) 331-7400
Email: jon.edel@klgates.com

- and -

/s/ R. Scott Shuker, Esq.
R. Scott Shuker, Esq.
**SHUKER & DORRIS, P.A.**
121 South Orange Ave., Suite 1120
Orlando, FL 32801
Telephone:  (407) 337-2060
Email: rshuker@shukerdorris.com
*Proposed Counsel for Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**www.flmb.uscourts.gov**

**In re:**                                      **CASE NO. 6:25-bk-06813**

**ORLANDO INTERNATIONAL**
**RESORT CLUB CONDOMINIUM**          **CHAPTER 11**
**ASSOCIATION, INC.,**
                           **Debtor.**          **SUBCHAPTER V**

_____/

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 23, 2025, a true and correct copy of the foregoing has been uploaded for filing with the Clerk of Court in the above-referenced bankruptcy case via the Court's CM/ECF system, which will furnish an electronic Notice of Filing to all parties in interest receiving CM/ECF electronic noticing, including the following, who are registered to receive electronic notices in this case: **UNITED STATES TRUSTEE – ORL** (USTP.Region21.OR.ECF@usdoj.gov).

**I FURTHER CERTIFY** that a true and correct filed copy the foregoing was submitted to Omni Agent Solutions, Inc. who will serve such by the United States Postal Service, via First Class United States Mail, postage prepaid on the creditors and interested parties on the mailing matrix attached to the original of this pleading filed with the Court on this 23rd day of October 2025 and will file a affidavit of service subsequent to this filing.

                                        /s/ R. Scott Shuker
                                        R. Scott Shuker

**Orlando International Resort Club**
**Condominium Association, Inc.**
**6:25-bk-06813**
**All creditor matrix**

Aarons Backflow Services Inc
130 Middle Street
Lake Mary, FL 32746

Advantage Golf Cars LLC
2049 W Landstreet Road
Orlando, FL 32809

Allied Universal
2301 Maitland Center Parkway
Suite 130, 140, 240
Maitland, FL 32751

Amadeus Hospitality Americas
75 New Hampshire Avenue
Suite 300
Portsmouth, NH 03801

Amazon Legal Department
2021 7th Avenue
Seattle, WA 98121

Amazon Legal Department
P.O. Box 81226
Seattle, WA 98108

Armstrong Consulting Inc.
7192 Kalanianaole
Highway A143A 329
Honolulu, HI 96825

Arrow Systems Intergration
1820 Preston Park Blvd.
Suite 2800
Plano, TX 75093

Arrow Systems Intergration
1820 Preston Park Blvd.
#2800
Plano, TX 75093

Ashberry Aquisition Company
5408 N 59th Street
Tampa, FL 33610

B&E Fire Safety
1927 North Main Street
Kissimmee, FL 34744

BradyPLUS
7055 S. Lindell Road
Las Vegas, NV 89118

BradyPLUS
34 East Court
Melbourne, FL 32904

CDS Resources LLC
2 Oakwood Blvd.
Suite 125
Hollywood, FL 33020

Charter Communications Hding
Time Warner Cable
BOX 223085
Pittsburgh, PA 15251-2085

Cintas Corporation
97627 Eagle Way
Chicago, IL 60678-7627

City of Orlando
Office of Permitting Service
P.O. Box 4990
Orlando, FL 32802-4990

City of Orlando Fire Dept.
P.O. Box 743808
Atlanta, GA 30374-3808

Convergeone Inc.
NW 5806
P.O. Box 1450
Minneapolis, MN 55485

Costco Whoesale Corp.
999 Lake Drive
Issaquah, WA 98027

Crown Linen LLC
3235 NW 62nd Street
Miami, FL 33147

Donna Bates
c/o Morgan & Morgan, P.A.
Attn: Varun Ramnarine, Esq.
P.O. Box 530244
Atlanta, GA 30353-0244

Dormakaba Canada Inc.
P.O. Box 896502
Charlotte, NC 28289

Dynamic Electric Service
517 Hufford Drive
Debary, FL 32713

Ecolab Inc.
DBA Ecolab Pest Elimination
26252 Network Place
Chicago, IL 60673-1262

Ecolab Inc.
P.O. Box 32027
New York, NY 10087-2027

Ecolab, Inc.
655 Lone Oak Drive
ESC A3
Eagan, MN 55121

EXP US Services Inc.
2601 Westhall Lane
Maitland, FL 32751

Extra Holidays LLC
8427 South Park Circle
Suite 500
Orlando, FL 32819

Falcon Risk Services
225 Liberty Street
36th Floor
New York, NY 10281

Fence Specialty LLC
3817 Blackberry Circle
Saint Cloud, FL 34769

Ferran Services & Contract
530 Grand Street
Orlando, FL 32805-4795

Frank Gay Services
3763 Mercy Star Court
Orlando, FL 32808

Gembecki Enterprises Inc.
1311 Seminola Blvd.
Casselberry, FL 32707

GSG Averigo LLC
16722 Parkside Avenue
Cerritos, CA 90703

HD Supply Inc.
P.O. Box 509058
San Diego, CA 92150-9058

Home Depot, Inc.
Attn: Legal Notices
2455 Paces Ferry Road, NW
Atlanta, GA 30339

Interconn Resources
2000A Southbridge Pkwy
Suite 330
Birmingham, AL 35209

InterConn Resources
2000A Southbridge Parkway
Suite 330
Birmingham, AL 35209

InterConn Resources LLC
HOU 1029
P.O. Box 650998
Dallas, TX 75265-0998

Internal Revenue Service
Centralized Insolvency Ops
P.O. Box 7346
Philadelphia, PA 19101-7346

JEH Construction Inc.
7729 Bardmoor Hill Circle
Orlando, FL 32835

Kings Service Solutions LLC
5547 S Orange Avenue
Orlando, FL 32809

Kings Service Solutions, LLC
10501 South Orange Avenue
Suite 111
Orlando, FL 32824

Landscape Workshop LLC
P.O. Box 738876
Dallas, TX 75373-8876

Landscape Workshop, LLC
550 Montgomery Highway
Suite 200
Vestavia Hills, AL 35216

Lloyd's Glass Services LLC
4502 SW 35th Street
Suite 400
Orlando, FL 32811

Lowe's Companies, Inc.
Attn: Legal Notice
1000 Lowe's Boulevard
Mooresville, NC 28117

Miller Seal Coating
7115 Blue Indigo Crescent
Winter Garden, FL 34787

Mobile Mini aka Willscot
2710 Michigan Ave.
Kissimmee, FL 34744

Mood Media
2100 S IH-35 Frontage Road
Suite 201
Austin, TX 78704

Mood Media North America
P.O. Box 71070
Charlotte, NC 28272

MyNetWire, LLC
9761 Crosspointe Blvd.
Suite 400
Indianapolis, IN 46256

Orange County Health Dept.
1001 Executive Center Drive
Suite 200
Orlando, FL 32803

Orange County Tax Collector
P.O. Box 545100
Orlando, FL 32854

Orlando Utilities Commission
P.O. Box 31329
Tampa, FL 33631

Publix Super Markets, Inc.
Attn: Customer Care
P.O. Box 407
Lakeland, FL 33802-0407

Publix Super Markets, Inc.
Attn: Legal Dept.
3300 Publix Corporate Pkwy.
Lakeland, FL 33811-3311

Resort Service Group Inc.
2963 Gulf to Bay Blvd.
Suite 100
Clearwater, FL 33759

Resort Supply Inc.
1625 SE Ankeny Street
Portland, OR 97214

Sam's Club
c/o CT Corp as Reg. Agent
1200 S. Pine Island Road
Fort Lauderdale, FL 33324

Spectrum Business
Legal Response Operations
12405 Powerscourt Drive
Saint Louis, MO 63131-3660

State of Florida
Dept. of Bus & Prof Reg.
2601 Blair Stone Road
Tallahassee, FL 32301-0783

Terminix Commercial
P.O. Box 802155
Chicago, IL 60668

Universal Protective Service
1551 N Tustin Avenue
Santa Ana, CA 92705

Wiring Technologies Inc.
1015 Sunshine Lane
Altamonte Springs, FL 32714

A-Quality Awnings Cabanas
2115 West Central Blvd.
Orlando, FL 32805

RSG/Spectrum
2963 Gulf to Bay Blvd.
Suite 100
Riverview, FL 33579

ScentAir Technologies
3810 Shutterfly Road
Suite 900
Charlotte, NC 28217-3071

Spies Pool LLC
801 Sawdust Trail
Kissimmee, FL 34744

Stephens Insurance LLC
111 Center Street
Suite 100
Little Rock, AR 72201-4451

The Sherwin-Williams Company
8414 S Orange Blossom Trail
Orlando, FL 32809-7906

Walmart Inc.
Attn: Legal Department
702 SW 8th Street
Bentonville, AR 72716-0160

Wyndham Vacation Management
6277 Sea Harbor Drive
Orlando, FL 32821

Sam's Club
Attn: Legal Department
702 SW 8th Street
Bentonville, AR 72716

Sobel Linen
2670 S Western Avenue
Las Vegas, NV 89109

State Lakes Inc.
409 Chestnut Avenue
Altamonte Springs, FL 32701

TECO Gas
P.O. Box 31318
Tampa, FL 33631

Total Key Control Inc.
7777 N Wickham Road
Suite 12603
Melbourne, FL 32940

Wells Fargo
P.O. Box 63020
San Francisco, CA 94163

Wyndham Vacation Resorts Inc
c/o CSC as Reg Agent
1201 Hays Street
Tallahassee, FL 32301-2525

**<u>EXHIBIT A</u>**

**(Proposed Interim Order)**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**www.flmb.uscourts.gov**

IN RE:                                                            **Case No. 6:25-bk-06813**

**ORLANDO INTERNATIONAL RESORT CLUB**          **Chapter 11**
**CONDOMINIUM ASSOCIATION, INC.,**[1]              **Subchapter V**

                        **Debtor.**
_____/

**INTERIM ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO**
**(A) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM,**
**(B) MAINTAIN BANK ACCOUNTS AND CONTINUE USE OF**
**EXISTING BUSINESS FORMS AND CHECKS, AND (C) HONOR**
**CERTAIN RELATED PREPETITION AND POSTPETITION OBLIGATIONS;**
**(II) DETERMINING COMPLIANCE WITH, OR GRANTING A WAIVER OF,**
**CERTAIN INVESTMENT AND DEPOSIT**
**GUIDELINES; AND (III) GRANTING RELATED RELIEF**

        **THIS CASE** came before the Court on _____, 2025, at _____ a.m./p.m., in

Orlando, Florida for a hearing (the "Hearing") upon Debtor*'s Emergency Motion for Interim and*

*Final Orders (I) Authorizing Debtor to (A) Continue to Use Existing Cash Management System,*

*(B) Maintain Bank Accounts and Continue Use of Existing Business Forms and Checks, and*

*(C) Honor Certain Related Prepetition and Postpetition Obligations; (II) Determining*

*Compliance with, or Granting a Waiver of, Certain Investment and Deposit Guidelines; and*

*(III) Granting Related Relief* (the "Motion")[2] [ECF No. _____] filed by the above-captioned

debtor and debtor-in-possession for entry of an interim order (the "Interim Order") for authority,

among other things, to maintain its existing Bank Accounts and to continue to use its existing Cash

Management System and Business Forms and for a waiver of certain investment and deposit

---

[1] The last four digits of Debtor's tax identification number are 2126.  Debtor's primary place of business is 5353 Del Verde Way, Orlando, Florida 32819.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

guidelines.  The Court, having considered the Motion, finds that: (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (c) this matter is core pursuant to 28 U.S.C. § 157(b)(2); (d) the Court may enter a final order consistent with Article III of the United States Constitution; (e) notice of the Motion and the Hearing thereon was sufficient under the circumstances and no other or further notice need be provided; (f) the relief requested in the Motion is in the best interest of Debtor, its estate, its creditors and other parties in interest; and (g) upon a review of the record before the Court, including the legal and factual bases set forth in the Motion and the First Day Declaration and the statements made by counsel at the Hearing, and being otherwise fully advised in the premises, does for the reasons stated on the record of the Hearing, all of which are incorporated herein; and after due deliberation and sufficient cause appearing therefor, has determined that good and sufficient cause exists to grant the relief requested. Accordingly, it is

**ORDERED THAT:**

1.      The Motion is **GRANTED**, on an interim basis, effective as of the Petition Date.

2.      Debtor is authorized to maintain and use its existing Cash Management System, as more fully set forth in the Motion.  In connection with the ongoing utilization of the Cash Management System, Debtor shall continue to maintain strict records with respect to all transfers of cash so that all transactions may be readily ascertained, traced, recorded properly, and distinguished between prepetition and postpetition transactions.

3.      Debtor is authorized to maintain and use its existing Bank Accounts which are identified on the schedule attached as **Exhibit B** to the Motion in the names and with the account numbers existing immediately prior to the Petition Date.

2

4.     The Banks are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of Debtor, as debtor in possession, without interruption and in the ordinary course of business consistent with past practice, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, credit card payments, and ACH transfers issued and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be, and all such Banks are authorized to rely on Debtor's designation of any particular check or electronic payment requests as approved by this Interim Order; *provided that*, subject to paragraph 5, Debtor shall only instruct or request any Bank to pay or honor any check, draft, or other payment item issued on a Bank Account prior to the Petition Date but presented to such Bank for payment after the Petition Date as authorized by an order of the Court.

5.     The Banks are authorized to debit the Bank Accounts in the ordinary course of business, consistent with past practice, without the need for further order of this Court, for: (a) all checks drawn on the Bank Accounts that are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (b) all checks, automated clearing house entries, and other items deposited or credited to one of the Bank Accounts with such Bank prior to the Petition Date that have been dishonored, reversed, or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent Debtor was responsible for such items prior to the Petition Date; and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Cash Management System.

6.     Any existing deposit agreements between or among Debtor, the Banks, and other parties shall continue to govern the postpetition cash management relationship between Debtor and the Banks, and all of the provisions of such agreements, including, without limitation,

the termination and fee provisions, rights, benefits, offset rights and remedies afforded under such agreements, shall remain in full force and effect unless otherwise ordered by the Court, and Debtor and the Banks may, without further order of this Court, agree to and implement changes to the Cash Management System and cash management procedures in the ordinary course of business, pursuant to the terms of those existing deposit agreements, including, without limitation, the opening and closing of bank accounts.

7.      The Banks are authorized, without further order of this Court, to charge back to the appropriate accounts of Debtor any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, or other electronic transfers of any kind, regardless of whether such returned items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

8.      Subject to the terms set forth herein, the Banks may rely upon the representations of Debtor with respect to whether any check, draft, wire, transfer, or other payment order drawn or issued by Debtor prior to the Petition Date should be honored pursuant to any order of this Court, and no such Bank shall have any liability to any party for relying on such representations by Debtor as provided for herein.

9.      The Banks are further authorized to honor Debtor's directions with respect to the opening and closing of any Bank Account and accept and hold, or invest, Debtor's funds in accordance with Debtor's instructions; *provided that* the Banks shall not have any liability to any party for relying on such representations to the extent such reliance otherwise complies with applicable law.

10.     Debtor is authorized, but not directed, to maintain and use its existing Corporate Credit Cards in the ordinary course of business consistent with prepetition practice, including honoring any outstanding obligations incurred related to the Corporate Credit Cards whether they arose prepetition or postpetition, subject to the limitations of this Interim Order and any other applicable interim and/or final orders of this Court.  Debtor is further authorized to continue to use the Corporate Credit Cards and related loan documents pursuant to which the obligations in respect of the Corporate Credit Cards are included as obligations thereunder.  Any Bank may rely on the representations of Debtor with respect to its use of the Corporate Credit Cards, and such Bank shall not have any liability to any party for relying on such representations by Debtor as provided for herein.

11.     Any existing agreements between or among Debtor and any bank in respect of the Corporate Credit Cards program shall continue to govern the postpetition relationship between Debtor and such bank, and all of the provisions of such agreements, including, without limitation, the termination and fee provisions, rights, benefits, offset rights and remedies afforded under such agreements, shall remain in full force and effect unless otherwise ordered by the Court, and Debtor and such bank may, without further order of this Court, agree to and implement changes related to the Corporate Credit Cards in the ordinary course of business, pursuant to the terms of those existing agreements.

12.     Debtor is authorized, but not directed, to maintain and use its existing D&O Expense Program in the ordinary course of business consistent with prepetition practice, including honoring any outstanding obligations incurred as Corporate Expenses whether they arose prepetition or postpetition, subject to the limitations of this Interim Order and any other applicable interim and/or final orders of this Court.  The relevant directors and officers are further authorized

to continue to rely on the D&O Expense Program and related documents and incur, submit, and be reimbursed for Corporate Expenses in accordance with prepetition, ordinary course practice. Any Bank may rely on the representations of Debtor with respect to its reimbursement of Corporate Expenses, and such Bank shall not have any liability to any party for relying on such representations by Debtor as provided for herein.

13.    Debtor is authorized to pay all prepetition Processing Fees and Bank Fees and to continue to pay such Processing Fees and Bank Fees in the ordinary course of business postpetition.

14.    For purposes of this Interim Order, the requirements in the Guidelines promulgated by the Office of the United States Trustee are each separately and collectively excused pending a final hearing, including, for the avoidance of doubt, the requirements that Debtor (a) close all existing bank accounts and open new debtor in possession ("DIP") bank accounts in certain financial institutions designated as authorized depositories by the U.S. Trustee, (b) establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), (c) maintain a separate DIP account for cash collateral, (d) obtain checks for all DIP accounts that bear the designation, "debtor-in-possession," the bankruptcy case number, and the type of account, and (e) close its books and records as of the petition date and to open new books and records. Debtor shall continue, pending such final hearing, to work with the Office of the United States Trustee for the Middle District of Florida to address the issues set forth herein, and, where feasible, to comply with the Guidelines.

15.    Debtor shall retain the authority to close certain of its Bank Accounts and open new debtor-in-possession accounts, or otherwise make changes to its Cash Management System as it deems necessary to facilitate the Chapter 11 Case and operations.  In the event that Debtor opens

6

or closes any additional bank accounts, such opening or closing shall be timely indicated on Debtor's monthly operating reports and/or notice of such opening or closing shall be provided to the Office of the United States Trustee for the Middle District of Florida three (3) days prior to such opening or closure.

16.     Debtor is authorized to deposit funds in and withdraw funds from its Bank Accounts by all usual means including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers, and other debits and to treat the Bank Accounts for all purposes as debtor-in-possession accounts.

17.     Debtor is authorized to continue to use its prepetition business forms, including, but not limited to, purchase orders, letterhead, envelopes, promotional materials, checks, and other business forms, substantially in the forms existing immediately prior to the Petition Date, without reference to Debtor's debtor-in-possession status.

18.     The Banks maintaining Debtor's Bank Accounts that are listed on **Exhibit B** to the Motion, and any and all other financial institutions receiving or transferring funds from or to Debtor, are authorized and directed to cooperate with respect to Debtor's efforts to maintain and use its Cash Management System and accounts.

19.     For purposes of this Interim Order, Debtor is authorized to deposit funds in accordance with its established deposit practices in effect as of the commencement of this case and, to the extent that such deposit practices are not consistent with the requirements of section 345(b) of the Bankruptcy Code or the Guidelines for chapter 11 cases, such requirements are waived, on an interim basis, until the final hearing, without prejudice to Debtor's right to seeks a further and/or final waiver.

20.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

21.     The notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

22.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

23.     Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

**24.     The Court shall conduct a final hearing on the Motion on _____ 2025 at ____ a.m./p.m., United States Bankruptcy Court, George C. Young, Federal Courthouse, 400 West Washington Street, Courtroom _____, Orlando, Florida 32801.**

25.     The Court retains jurisdiction to hear and determine all matters arising from or relating to the interpretation or implementation of this Interim Order.

# # #

*Attorney R. Scott Shuker is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF and file a proof of service within three days of entry of this Order.*

**EXHIBIT B**

**(Schedule of Bank Accounts)**

| No. | Bank | Type | Authorized Institution | Acct. No. (Last 4 digits) | Balance[1] |
|---|---|---|---|---|---|
| 1 | Merrill Lynch | Working Capital Management Account (Operating) | No | x7912 | $75,631.48 |
| 2 | Merrill Lynch | Working Capital Management Account (Reserve) | No | x7833 | $5,409,652.60 |
| 3 | Merrill Lynch | Working Capital Management Account (Tax) | No | x7913 | $362,148.38 |
| 4 | Comerica Bank | Checking | Yes | x7769 | $0.00 |
| 5 | Comerica Bank | Sweep | Yes | x6897 | $1,352.57 |
| 6 | Wells Fargo Bank | Checking – Sweep | Yes | x8320 | $598,218.14 |

---

[1] Balance information is as of October 22, 2025.